**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| In re: ) | |
| ) | |
| MCSGLOBAL INCORPORATED, ) | Case No. 15-11674-BFK |
| ) | Chapter 11 |
| Debtor. ) | |

**MEMORANDUM OPINION**

This Memorandum Opinion is issued in support of the Order Granting the Chapter 11 Trustee's Motion for Entry of Order: (A) Approving Sale of Assets Free and Clear of Liens, Claims, and Encumbrances; (B) Approving Assumption and Assignment of Executory Contracts, (C) Approving Settlement of Claims; and (D) Prohibiting Assertion of Estate Claims, entered on December 21, 2016. Docket No. 188. The Trustee's Motion is at Docket No. 182. ProLink Services, LLC-Holding. ("ProLink"), a creditor, filed an Objection to the Trustee's Motion. Docket No. 186. The Trustee filed a Reply Memorandum. Docket No. 187. The Court heard the evidence and the arguments of the parties on December 20, 2016. At the conclusion of the hearing, the Court ruled that it would grant the Trustee's Motion.

**Findings of Fact**

The Court, having heard the evidence, makes the following findings of fact:

1.      MCSGlobal Incorporated ("MCS" or the "Debtor") is a Virginia corporation. It is owned by Enterprise Consulting Partners, Inc. ("ECP"), which in turn is wholly owned by Paragon Systems, Inc. ("Paragon"). Paragon is 100% owned by Suresh Doki.

2.      MCS is in the business of information technology ("IT") staffing. At the start of this case, MCS had 17 IT employees and 2 administrative employees. As of the hearing on December 20, 2016, MCS had 14 IT employees and 2 administrative employees. The IT

1

employees are in the United States on H-1B Visas (also known as specialty occupation Visas). *See* https://www.uscis.gov/eir/visa-guide/h-1b-specialty-occupation/understanding-h-1b-requirements.

        A.    *The Fairfax County Judgment and the Garnishment Proceedings.*[1]

3.    On June 25, 2010, the Circuit Court of Fairfax County entered a Final Judgment Order in favor of ProLink, against Cambridge Global Services, Inc. ("CGS"), Cambridge Systems, Inc. ("CSI") and Madhavi Doki (who is Mr. Doki's wife), in the amount of $699,346.00, plus attorney's fees and costs in the amount of $61,435.09.

4.    In its efforts to collect on its Judgment, ProLink served a garnishment summons on MCS as an alleged account debtor to one or more of the judgment debtors. Ultimately, this resulted in a judgment being entered by the Circuit Court on September 5, 2014, in favor of ProLink and against MCS in the amount of $774,749.22.

5.    ProLink served MCS with a summons to answer debtor's interrogatories, in order to discover assets, if any, upon which ProLink could satisfy its judgment. MCS filed a voluntary petition under Chapter 11 in this Court on May 14, 2015, shortly before the scheduled start of the debtor's interrogatory hearing.

        B.    *MCS's Corporate History.*

6.    In September 2010, CGS sold MCS to Hyperion Consulting, Inc. ("Hyperion"), a wholly-owned subsidiary of Kellton Tech Solutions, Ltd. ("Kellton"). Hyperion later transferred its ownership of MCS to Kellton.

---

[1] The Findings of Fact in Parts (A) and (B), below, are taken from the Court's Findings of Fact and Conclusions of Law in connection with ProLink's Motion to Convert the MCSGlobal bankruptcy case to Chapter 7. Docket Nos. 31 (ProLink Motion), 54 (Findings of Fact and Conclusions of Law). The Findings of Fact in Parts (A) and (B) are not contested.

7. Kellton, unhappy that MCS was the subject of the Judgment in favor of ProLink, demanded indemnification from Mr. Doki under the September 2010 asset purchase agreement.

8. In settlement of Kellton's demand for indemnification, Mr. Doki agreed to repurchase MCS from Kellton. On October 18, 2014, Mr. Doki agreed to repurchase MCS from Kellton for the purchase price of $666,952.00. Mr. Doki decided to use ECP, which as noted above is owned by Paragon, for the purpose of taking ownership of MCS.

9. Of the $666,952.00 purchase price for MCS, Mr. Doki paid the initial $266,781.00 called for under Section 1.2.1 of the Stock Purchase Agreement. The Stock Purchase Agreement also called for a Secured Promissory Note in the amount of $400,171.00. None of the payments due under the Note have been made, and the Note is in default.

        *C.     The Appointment of the Chapter 11 Trustee and the Trustee's Asset Purchase Agreement With Mr. Doki.*

10. On October 20, 2015, ProLink filed a Motion to Convert the MCS case to Chapter 7. Docket No. 31.

11. The Court denied the Motion to Convert, but sua sponte directed the appointment of a Chapter 11 Trustee, owing to Mr. Doki's conflicts of interest. Docket Nos. 54 (Findings of Fact and Conclusions of Law), 55 (Order). The U.S. Trustee appointed Bradford Englander as the Chapter 11 Trustee and the Court confirmed his appointment. Docket Nos. 60 (Appointment), 65 (Order Approving Appointment).

12. The Court approved the employment of Mr. Englander's law firm, Whiteford, Taylor & Preston, LLP ("Whiteford Taylor") as his counsel. Docket No. 79. The Court also approved the employment of Analytic Financial Group, LLC, as the Trustee's Financial Advisor, and Mendelson & Mendelson, CPAs, P.C., as the Trustee's tax accountants. Docket Nos. 80, 93.

13. On July 22, 2016, the Trustee filed a Motion to approve the sale of substantially all of the assets of the estate to Mr. Doki. Docket No. 110 (Motion), 113 (Corrected Motion). The purchase price was $200,000.00. Docket No. 113, Asset Purchase & Sale Agreement ¶ 2. The Asset Purchase Agreement also provided for a release of claims by the Trustee in favor of Mr. Doki. *Id.*, ¶ 10, Ex. B.

14. ProLink did not object to the Trustee's Motion; Kellton did object. Docket No. 121. Kellton also moved for a continuance of the sale hearing in order to conduct discovery on the Trustee's Motion, which the Court granted. Docket Nos. 123 (Motion to Continue); 132 (Hearing Continued), 142 (Order Setting Hearing).

15. In the meantime, the Trustee sought discovery from Kellton. Docket Nos. 74 (Motion for Rule 2004 Examination), 81 (Consent Order Granting Rule 2004 Examination). The Trustee filed a Motion to Compel, which was resolved with a Consent Order. Docket Nos. 127 (Tr.'s Mot. to Compel), 150 (Consent Order).[2]

16. On September 23, 2016, the Court granted the Trustee's Motion to sell substantially all of the assets to Mr. Doki. Docket No. 172.

17. Mr. Doki defaulted. On September 30, 2016, the Trustee's counsel sent Mr. Doki's counsel a notice of default and a termination of the Asset Purchase Agreement. Tr. Ex. 2.[3]

---

[2] Kellton also filed a Motion for leave to file a late proof of claim. Docket No. 120. ProLink objected to this Motion. Docket No. 163. The Court granted Kellton's Motion after an evidentiary hearing, finding that Kellton's failure to file a timely proof of claim was the product of excusable neglect and that there was no prejudice to the bankruptcy estate. Docket No. 174.

[3] The Trustee's Exhibits are referred to herein as "Tr. Ex. __." ProLink's Exhibits are referred to as "ProLink Ex. __."

        *D.*      *The Trustee's Asset Purchase Agreement with Kellton.*

18.    On November 23, 2016, following Mr. Doki's default, the Trustee filed a Motion to sell substantially all of the assets to Kellton. Docket No. 182. This time, ProLink objected. Docket No. 186.

19.    The Trustee's Asset Purchase Agreement with Kellton (the "Kellton APA") provided for the same $200,000.00 purchase price as the Trustee's Agreement with Mr. Doki. Tr. Ex. 1, ¶ 2. The Trustee would retain all claims and causes of action against. Mr. Doki. *Id.*, ¶ 1.1 ("Excluded Assets"). The Kellton APA also allows the bankruptcy estate to retain all pre-closing cash, which the Trustee estimated to be approximately $143,000.00. *Id.* ("Cash on Hand at Closing (as defined below)"). The Asset Purchase Agreement further requires Kellton to pay up to $136,746.37 in Deferred Salaries owed to the employees. *Id.*, ¶ 2.3 (Excluded Liabilities).

20.    The Trustee testified that the APA also requires Kellton to pay the last payroll for the MCS employees, which the Trustee estimated to be approximately $70,000.00, if the sale closes by December 31, 2016. *Id.*, ¶ 2.3(B) (Assumption of Liabilities includes "All unpaid operating expenses and liabilities of MCSGlobal arising from and after the Petition Date, including without limitation, payroll, payroll taxes….")

21.    The Trustee further testified that MCS's operating liabilities exceed its cash balance. It has payroll of approximately $120,000 per month. Further, it has approximately $137,000 in deferred compensation that it owes to its employees (which, as noted, Kellton has agreed to pay under the terms of the APA).

22.    MCS has no lines of credit. To date, the bankruptcy estate has accrued approximately $400,000.00 in post-petition, administrative liabilities. In the Trustee's view, MCS has no going concern value and has no ability to sell itself as a going concern absent the

5

litigation release being provided to Kellton under the APA. The Trustee concedes that MCS is administratively insolvent, and that ProLink as an unsecured creditor is "out of the money," which is to say ProLink cannot realistically expect a distribution on its unsecured claim unless the Trustee achieves some litigation recovery against Mr. Doki or others.

23. The Trustee testified that he sought to engage a business broker in order to market the assets, but that he was advised that he could not do better than the deal with Kellton.

24. Moreover, the Trustee testified, if he terminated the Debtor's business operations the Debtor would be obligated to repatriate all of the H-1B Visa employees to their countries of origin, thereby giving rise to additional administrative expenses. Kellton has agreed to assume these expenses as a party of the APA. *Id.*, ¶ 2.3(C) (Assumption of Liabilities includes "All immigration related obligations….")

25. The Kellton APA provides Kellton with a full and complete release of claims. The APA also requires the Trustee to deliver a Bar Order, prohibiting and enjoining creditors (most notably, ProLink) from pursuing any litigation against Kellton on account of "any claim or cause of action that is property of the Seller." *Id.*, ¶ 4.1

    E.    *ProLink's Objections.*

26. ProLink objects to the Trustee's Motion on two grounds. First, ProLink argues that the Trustee is settling too cheap, because the bankruptcy estate has substantial claims against Kellton for pre-petition transfers that would be recoverable but for the release contemplated by the APA. ProLink argues that, in addition to the approximately $650,000.00 in net transfers to Kellton from MCS identified by the Trustee (discussed below), Kellton is liable to the bankruptcy estate for an alleged transfer of approximately $1.1 million from MCS to Kellton (or more accurately the retention of the funds by Kellton) when Kellton put MCS back to Mr. Doki in October 2014.

27. ProLink's second objection is that the proposed Bar Order would prevent it from pursuing litigation against Kellton. During the course of the bankruptcy case, ProLink sued Kellton in the U.S. District Court for the Eastern District of Virginia. *ProLink Services, LLC – Holding v. Kellton Tech Solutions*, Civil No. 1:15-cv-01547-TSE-IDD. ProLink's claims against Kellton were: (a) breach of fiduciary duty, arising out of the alleged transfer of the $1.1 million from MCS to Kellton; and, alternatively (b) a fraudulent transfer claim for the same funds, under Va. Code § 55-80 (transfers made with the actual intent to hinder, delay or defraud creditors). ProLink dismissed its Complaint without prejudice in June 2016, after the Trustee asserted that ProLink's claims were property of the estate and that ProLink's lawsuit violated the automatic stay (11 U.S.C. § 362(a)).

28. The Trustee's response is that, in his view, the APA with Kellton is more valuable and more certain than the litigation claims against Kellton. The Trustee estimated the "best realistic" possible outcome of litigation with Kellton to be approximately a $650,000.00 recovery. *See* Tr. Ex. 7. The Trustee also acknowledged that Kellton had potential defenses to any claims, including whether MCS was insolvent at the time of the transfers or was rendered insolvent by the transfers, and that the recovery against Kellton could potentially be zero.[4]

29. The Trustee testified that, despite a diligent search, he was unable to document the transfer or retention of $1.1 million in funds in October 2014, when Kellton put MCS back to Mr. Doki. *See* Tr. Ex. 12 (MCSGlobal Bank of America bank statement for October 2014). The

---

[4] ProLink is correct in arguing that insolvency is not an element of a fraudulent transfer claim under Va. Code § 55-80. On the other hand, insolvency at the time of a transfer is considered to be one of the badges of fraud that may support a fraudulent transfer claim. *In re SunSport, Inc.*, 260 B.R. 88, 111 (Bankr. E.D. Va. 2000) ("insolvency or the absence thereof on the part of the transferor is simply one additional factor to be taken into account when the court decides whether the trustee has established his *prima facie* case"); *Hyman v. Porter (In re Porter),* 37 B.R. 56, 63 (Bankr. E.D. Va. 1984) ("insolvency taken together with other circumstances may show sufficiently fraudulent intent"). A showing of insolvency is generally required for constructively fraudulent transfer claims under Bankruptcy Code § 548(a)(1)(B) and Va. Code § 55-81.

Trustee further testified that, with respect to this alleged transfer of $1.1 million, he believed that MCS's books and records were simply inaccurate and unreliable.

30.     ProLink was unable to produce any evidence of such a transfer or bank balance other than a document entitled MCSGlobal Incorporated Balance Sheet Detail as of May 14, 2015. ProLink Ex. 1. The Balance Sheet, however, is of uncertain origin and is not backed up by any original bank documents evidencing a transfer or a bank balance of this magnitude. ProLink did not call Mr. Doki to testify as to this entry on the Balance Sheet.

31.     Mr. Potluri, who is now Kellton's CEO and acted as MCS's President and CEO for two and a half years when Kellton owned MCS, testified that he had not seen the Balance Sheet before and was not familiar with its content. On redirect, Mr. Potluri testified that Kellton did not receive $1.1 million from MCS; in his view, there was no money to be had from MCS.

32.     On cross-examination, Mr. Potluri acknowledged that at one time Kellton was willing to pay the Trustee as much as $550,000.00 for the assets, but he testified that: (a) this was when Mr. Doki was a competing bidder and Mr. Doki later dropped out of the bidding after he defaulted with the Trustee; and (b) the $550,000.00 offer required a complete release of claims from ProLink, which ProLink was never willing to provide.

### Conclusions of Law

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Order of Reference of the U.S. District Court for this District entered August 15, 1984. This is a core proceeding under 28 U.S.C. § 157(b)(2)(N) (orders approving the sale of property).

As noted above, ProLink has two objections to the Trustee's sale: (a) that the Trustee is selling too cheap, when one considers the potential fraudulent transfer claim against Kellton; and

(b) the Trustee's proposed Bar Order is unwarranted. The Court will consider ProLink's objections, in turn.

## I. The Court Will Approve the Trustee's Exercise of his Business Judgment.

Bankruptcy Code Section 363(b) allows a trustee to sell property of the estate outside of the ordinary course of business, after notice and a hearing. 11 U.S.C. § 363(b). A sale of substantially all of the assets of the estate prior to plan confirmation requires a "sound business purpose," which in turn requires: (1) a sound business reason or emergency justifying a pre-confirmation sale; (2) that the sale has been proposed in good faith; (3) adequate and reasonable notice of the sale has been provided to interested parties; and (4) the purchase price is fair and reasonable. *In re W.A. Mallory Co., Inc.,* 214 B.R. 834, 836 (Bankr. E.D. Va. 1997); *In re WBQ P'ship*, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995). Courts generally look to the trustee's business judgment in analyzing asset sales under Section 363(b). *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Alpha Nat. Res., Inc.,* 546 B.R. 348, 356 (Bankr. E.D. Va. 2016). There is no question in this case that there has been adequate notice to all of the creditors and interested parties. Further, there isn't any question that the Trustee is proceeding in good faith. The Court turns, then, to the elements of whether there is a sound business reason for the sale and whether the purchase price is fair and reasonable.

The Trustee testified that the Debtor is consistently losing money in the post-petition environment. The Debtor's operating liabilities exceed its cash balance and, in the Trustee's view, matters are likely to get worse. The Debtor has no available lines of credit. In the Trustee's opinion, there is no going concern value, other than a sale that provides a party like Kellton, a potential litigation target, with a release of claims. The Trustee sought to engage a business broker, but was advised that he was unlikely to find a purchaser willing to pay anything more

than Kellton. If the Trustee were to terminate operations in order to stem the tide of losses, he would give rise to substantial post-petition liabilities for the repatriation of all of MCS's 14 IT employees under the H-1B Visa program. The Court finds, given all of these facts, that there is a sound business reason for the sale of substantially all of the Debtor's assets.

The second issue, whether the purchase price is fair and reasonable, also must be resolved in favor of the Trustee. The Trustee testified that in his judgment the claims against Kellton amount to approximately $650,000.00. In the Kellton APA, the Trustee: (a) is receiving $200,000.00 in cash, (b) will retain the estate's cash ($143,000.00), (c) will avoid a December 30th payroll ($70,000.00), and (d) will avoid the deferred compensation liability to the employees ($137,000.00), and will avoid the H-1B Visa repatriation expenses of the employees in the event of a shutdown. ProLink does not contest these facts. Rather, ProLink argues that the Trustee is not giving due consideration to the $1.1 million transfer or retention described in its Exhibits 1 and 2, the MCS Balance Sheet. The difficulty for ProLink, however, is that after having had the benefit of discovery in the District Court and in this Court in connection with this Motion and in connection with its Motion to convert the case to Chapter 7, ProLink has never produced a bank account statement evidencing that the $1.1 million ever existed. The MCS Balance Sheet is of questionable origin and was not authenticated by any former MCS corporate officer or employee. The Bank of America bank statement for October 2014 does not contain anything close to a $1.1 million balance. Under the circumstances, the Court can understand why the Trustee puts no stock in the MCS Balance Sheet and does not want to pursue an alleged fraudulent transfer that might never have occurred.

The Trustee's business judgment is well founded in this case. The purchase price represented by all of the terms of the Kellton APA is fair and reasonable. The complexities and

expense of any fraudulent transfer litigation against Kellton, along with the uncertainty of any litigation result, are far outweighed by the benefits to the estate of the Kellton APA. The Court will approve the Kellton APA as being a reasonable exercise of the Trustee's business judgment and in the best interests of the estate.

## II.     The Court Will Approve the Bar Order.

Bankruptcy Rule 9019 provides for the approval of settlements on notice to the creditors and other parties in interest. In reviewing a proposed settlement, the Court must review the trustee's probability of success, as well as "the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *see also In re Frye*, 216 B.R. 166, 174 (Bankr. E.D. Va. 1997) (factors include the probability of success, the potential difficulties if any in collection, the complexity of the litigation, and the paramount interests of the creditors). ProLink objects to the Trustee's settlement with Kellton on the ground that the Trustee's proposed Bar Order will prohibit ProLink from pursuing its claims against Kellton. The Court understands ProLink's frustration here, but under the facts of this case the Court will approve the settlement.

The Court notes at the outset that the Trustee's proposed Bar Order does not implicate the factors set out in *National Heritage Foundation, Inc. v. Highbourne Foundation*, 760 F.3d 344 (4th Cir. 2014), for the approval of third party releases. In *National Heritage*, the Fourth Circuit held that in order to approve third-party releases, that is releases of creditors' claims against third parties (in *National Heritage*, against the Debtor's officers and directors), the court is required to review the proposed releases under the seven-factor test contained in *Class Five Nevada*

11

*Claimants v. Dow Corning Corp. (In re Dow Corning Corp.),* 280 F.3d 648 (6th Cir. 2002). In this case, the Trustee has been very careful to affirm that he is not seeking a release of third-party claims; rather, the Trustee is seeking a release of the *estate's* claims against Kellton and a corresponding Bar Order to prevent creditors such as ProLink from asserting claims that are released in the settlement against Kellton.

When a bankruptcy case is filed, an estate is created which consists of all of the assets of the debtor including all pre-petition causes of action. 11 U.S.C. § 541(a). The Fourth Circuit has held that the maintenance of claims by creditors that may interfere with the bankruptcy trustee's causes of action will be stayed by the automatic stay. *Nat'l Am. Ins. Co. v. Ruppert Landscaping Co., Inc.,* 187 F.3d 439 (4th Cir. 1999). In *Ruppert Landscaping*, certain sureties brought an action against the transferee of the debtor's assets, including claims for successor liability, tortious interference with contract, and statutory and common law conspiracy. The Fourth Circuit held that the trustee should have "first crack" at these claims, noting:

> To allow selected creditors to artfully plead their way out of bankruptcy court would unravel the bankruptcy process and undermine an ordered distribution of the bankruptcy estate…. The goal of bankruptcy is to consolidate the proceeding and avoid piecemeal litigation-a goal that would be sacrificed by permitting the district court to entertain the merits of the Sureties' suit.
>
> Reserving the action for the trustee maintains the integrity of the bankruptcy proceeding and ensures that individual creditors cannot hijack the bankruptcy process. If it were otherwise, there would be "a multijurisdictional rush to judgment whose organizing principle could only be first-come-first-served."

187 F.3d at 442 (citations omitted).

Similarly, in *Fidelity National Title Insurance Co. v. Bozzuto,* 227 B.R. 466 (E.D. Va. 1998), the District Court dismissed certain claims because they had previously been released by a bankruptcy trustee in a related bankruptcy case. The court, relying on the Fourth Circuit's prior decision in *Steyr-Daimler-Puch of America Corp. v. Pappas*, 852 F.2d 132 (4th Cir. 1988), held

that a bankruptcy trustee's settlement and release of claims barred the maintenance of an alter ego claim against third parties, but did not bar direct breach of contract and conversion claims. 227 B.R, at 471-73.

Bar orders of the kind proposed by the Trustee in this case have gained currency in the *Madoff*-related cases in the Second Circuit. There, the Second Circuit has made a distinction between direct, or "particularized," claims of creditors (for which the trustee does not have standing and which cannot be released) and claims that are derivative of the trustee's claims and that are common to all creditors. *In re Bernard L. Madoff Securities, LLC*, 740 F.3d 81 (2nd Cir. 2014). The Second Circuit noted in its decision that the bankruptcy courts should be "wary of placing too much significance on the labels [plaintiffs] attach to their complaints." *Id*. at 91.

In this case, ProLink has asserted State-law claims for breach of fiduciary duty and fraudulent transfer against Kellton. The Court will examine both claims to determine whether they are particular to ProLink or are derivative of the Trustee's rights.

    A.  *ProLink's Claim for Breach of Fiduciary Duty.*

ProLink's first claim is that Kellton breached its fiduciary duty to ProLink when Kellton, as a shareholder in MCS, allegedly retained over $1.1 million when it put MCS back to Mr. Doki, thereby rendering MCS insolvent and unable to repay its legitimate debts. ProLink's fiduciary duty claim relies on a Virginia Supreme Court decision, *Marshall v. Fredericksburg Lumber Co.*, 173 S.E. 553 (1934). In *Fredericksburg Lumber*, the Virginia Supreme Court held:

> where there are existing creditors of a corporation the stockholders will not be permitted, as against those creditors, to withdraw the assets of the corporation without consideration, whether it be done through a purchase of stock by the corporation or otherwise. We repeat that a stockholder is not entitled to a share of the capital assets of a corporation until the debts have been paid.

13

173 S.E. at 557.[5]

In *Poth v. Rossey*, 99 F. App'x. 446 (4th Cir. Mar. 30, 2004), the Fourth Circuit affirmed the dismissal of a breach of a fiduciary duty claim brought by an individual who had entered into a merger agreement with a company by the name of Viasource Communications, Inc. Viasource later filed for bankruptcy. The District Court dismissed the breach of fiduciary duty claim on the ground that the plaintiff lacked standing. The Fourth Circuit, relying on *Ruppert Landscaping*, affirmed, holding that the breach of fiduciary duty claim was "so similar in object and purpose" as the bankruptcy trustee's fraudulent transfer claims that the plaintiff lacked standing. *Id.* at 457 ("When a creditor brings a state-law challenge to a transaction that a bankruptcy trustee could avoid as a fraudulent conveyance, the state-law cause of action is 'so similar in object and purpose' to the fraudulent conveyance claim that the creditor lacks standing to assert it") (Citation omitted).

More recently, Judge Huennekens of this Court held that the bankruptcy trustee properly asserted a *Fredericksburg Lumber* trust fund claim against the debtor's shareholders. *In re James River Coal Co.*, 360 B.R. 139, 180 (Bankr. E.D. Va. 2007) ("The Trustee has properly asserted a viable claim against the shareholder recipients of the Debtors' assets. The Trustee need not prove that the transfer occurred by commission of some wrong or unconscionable conduct, only that the transfer occurred outside the prescribed order of distribution and harmed creditors.")

In this case, ProLink asserts that Kellton owed it a fiduciary duty "as MCS's creditor." ProLink Opposition, Docket No. 186, p. 15. ProLink fails to establish that its claim for breach of fiduciary duty is any different from any of the other creditors' claims based on the same theory.

---

[5]  In the case of *Rapids Construction Co., Inc. v. Malone*, 139 F.3d 892 (table), 1998 WL 110151, *4 (4th Cir. Mar. 13, 1998), the Fourth Circuit noted that the *Fredericksburg Lumber* doctrine arises out of a trust fund theory, rather than a fraudulent conveyance theory. The Fourth Circuit also declined to decide the issue of whether Virginia's Corporate Code has eroded or replaced the *Fredericksburg Lumber* common law trust fund doctrine. *Id.* at n.6.

The Court finds that the breach of fiduciary duty claim is common to all creditors and is not particular to ProLink. The Court therefore finds that the Trustee's release of Kellton will bar ProLink's maintenance of the breach of fiduciary duty claim against Kellton.

### B.  *ProLink's Claim for Fraudulent Transfer.*

ProLink's second claim is one for fraudulent transfer under State law. Va. Code § 55-80. The Trustee has standing to bring fraudulent transfer claims under State law (through Bankruptcy Code § 544(b)) and under Section 548 of the Bankruptcy Code. In *Madoff,* the Second Circuit noted that "a typical fraudulent transfer claim is perhaps the paradigmatic example of a claim that is 'general' to all creditors." 740 F.3d at 91 (quoting *Highland Capital Mgmt., L.P. v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.),* 522 F.3d 575, 589, n. 9 (5th Cir. 2008)). Indeed, in *Ruppert Landscaping*, the plaintiffs' claims for successor liability and the like were barred precisely because they were similar in object and purpose to the bankruptcy trustee's potential fraudulent transfer claims. *Id.* at 441 ("Until the trustee has abandoned his potential fraudulent conveyance action, the Sureties cannot proceed with their claims in district court.")

The Court finds that ProLink's fraudulent transfer claim will be barred by the Trustee's settlement with Kellton.

### Conclusion

The Court finds approval of the Kellton APA to be in the best interests of all of the creditors of the estate, including the post-petition administrative creditors. Absent approval of the settlement, the Trustee will be forced to shut down the business, thereby giving rise to even more unpaid (and unpayable) administrative claims against the estate. There is no party willing to pay anything more for the assets of this Debtor.

For the foregoing reasons, the Court has entered an Order approving the Kellton APA including the Bar Order provisions contained therein.

Date: Jan 4 2017

/s/ Brian F. Kenney
Brian F. Kenney
United States Bankruptcy Judge

Copies to:

Entered on Docket: Jan 4 2017 mjt

Suresh Doki
MCSGlobal Incorporated,
22960 Shaw Road, Suite 605
Sterling, VA 20166
*Chapter 11 Debtor Designee*

Stephanie N. Gilbert, Esquire
Willcox & Savage, P.C.
440 Monticello Avenue, Suite 2200
Norfolk, Virginia 23510
*Counsel for Kellton Tech Solutions, Ltd.*

Dawn C. Stewart, Esquire
The Stewart Law Firm, PLLC
1050 Connecticut Ave. N.W., Tenth Floor
Washington, DC 20036
*Counsel for MCSGlobal Incorporated*

Genevieve Claire Bradley, Esquire
Roth Doner Jackson, PLC
8200 Greensboro Drive, Suite 820
McLean, VA 22102
*Counsel for ProLink Services LLC-Holding*

Bradford F. Englander, Esquire
David William Gaffey, Esquire
Whiteford Taylor & Preston, LLP
3190 Fairview Park Drive, Suite 800
Falls Church, VA 22042
*Counsel for the Chapter 11 Trustee*

Jack Frankel, Esquire
Office of the U.S. Trustee
115 South Union Street, Ste. 210
Alexandria, VA 22314
*Counsel for the U.S. Trustee*